**Xinda WANG, Appellant,**

v.

**Zhiping FENG, Appellee.**

**Xinda Wang, Appellee,**

v.

**Zhiping Feng, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 21, 2005.
Filed Dec. 13, 2005.

Bart M. Beier, Pittsburgh, for appellant.

Timothy J. Gricks, Pittsburgh, for Com., appellee.

Before: ORIE MELVIN,
McCAFFERY and POPOVICH, JJ.

ORIE MELVIN, J.

¶ 1 In this consolidated appeal, Husband, Xinda (David) Wang, and Wife, Zhiping (Penny) Feng, both appeal from an order of equitable distribution entered November 18, 2004 awarding Wife 100% of the marital estate, plus $83,830.00 in equitable reimbursement. In his appeal, Husband contends the trial court abused its discretion in entering the order of equitable distribution where Wife's contributions to his medical education/training did not exceed her legally imposed obligation of support, where Wife obtained an advanced degree during the marriage and where the parties remained married for six years after Husband began to out-earn Wife. In her cross-appeal, Wife has failed to file a brief. We affirm the order of equitable distribution and quash Wife's cross-appeal.

¶ 2 The trial court summarized the facts as follows:

The parties married on October 26, 1983 in Shanghai, China.... At [that] time ..., Husband was employed at Shanghai Hospital as a surgeon in the cancer ward, having completed his medical education in Shanghai. Because [his] opportunities for advancement in Shanghai were limited, the parties began discussing a move to the United States to pursue 'the America dream.'

In June 1986, Husband came to the United States by himself to pursue a fellowship with Sloan–Kettering Hospital in Rochester, New York. [He] procured a J–1 Visa, which is a visiting scholar visa that allowed [him] to learn about oncology research in the United States, but did not enable him to work as a physician or take classes. The J–1 visa lasted until 1988.

Wife remained with [the parties' daughter [1]] in China, where they lived with Wife's parents. A nanny and staff took care of [the daughter] while Wife, who holds a degree in English, worked as a tutor and for China International Travel Services. In September 1986, [she] obtained a J–2 Visa that permitted her to have limited employment in the United States. That year, [she] joined Husband in Rochester.

Wife had various jobs in the United States. [She] worked as a waitress before gaining employment with Field Tex Products in 1987, where she made purses. In 1988, [she] began employment at the Rochester Institute of Technology (RIT) and at Applied Research. Because Husband's visa did not allow him to be employed, Wife's income was the sole household income in 1986, 1987, and 1988.

In 1988, Husband returned to China to obtain a student visa. Upon acquiring [that] visa, [he] returned to the United States with [the parties' daughter]. [He] then began pursuing his Master's of Science and Ph.D. at RIT. At some point in 1988, both parties obtained resident alien status.

In 1990, Wife gained employment with Strathallan Hotel in Rochester as manager of housekeeping. [She] then completed a Master's in Travel and Tourism at RIT. [She] sought employment with her new degree, but because of Husband's enrollment at RIT, [she] was unable to leave Rochester to obtain employment commensurate with her degree. Therefore, [she] remained em-

---

1. The parties' daughter was 19 years old at the time of the hearing on equitable distribution.

ployed at the Strathallan Hotel. [She] explained that, with her Master's Degree, she was qualified for a position 'more closely related to an executive level of management,' but that the Strathallan did not have positions available for her to move up.

In 1995, Husband completed his Ph.D. In 1997, [he] was accepted to a residency program in internal medicine in Jacksonville, Florida. Wife ultimately obtained employment as housekeeping manager with Interstate Hotels in Jacksonville. This position was a step-down from [her previous hotel position], but it was the only employment [she] was able to obtain. While ... in Jacksonville, [she] began a computer science program, but was unable to complete [it] because of the parties' financial situation. [She] testified that her cousin completed the same degree program and was able to procure a job making over $50,000 per year. Notwithstanding her inability to switch her career field, [she] stated that if she had been able to obtain a position commensurate with her Master's degree in Travel and Tourism, she would have been able to earn roughly twice the amount of income that she earned from 1995 through 2000.[She] testified [ ] she limited her opportunity for career advancement because of her obligations to support the family.

Husband was supposed to complete his residency program in three years, but it took him four years because of difficulties with English in his first year. At the end of his residency in internal medicine, he decided that he wanted to return to his 'roots' in the medical profession, namely oncology. To that end, [he] applied for and obtained a fellowship in oncology at the University of Pittsburgh Medical Center [ ]. Wife was willing to make the move and attendant sacrifices for a third time in anticipation that Husband would make additional income. [She] testified that the fellowship was not necessary for Husband to practice medicine, but that he elected to seize this opportunity in order to become a specialist in the field of oncology and to earn more money.

The parties moved to Pittsburgh in the summer of 2001[and] purchased a residence in Upper St. Clair, PA. At trial, the parties stipulated that the 2003 assessed value of that residence is $163,800 and that the net equity value is $39,000. On November 6, 2001, without any prior discussion of separation, Husband left the marital residence. In April 2002, Wife obtained employment with Embassy Suites hotel as executive housekeeper where she remains employed today.

Trial Court Opinion, 2/22/05, at 2–6 (record citations omitted).

¶ 3 Husband filed a complaint in divorce on February 24, 2004. On June 3, 2004, the trial court found the marriage irretrievably broken. On November 9, 2004, the trial court held a hearing on, *inter alia*, Wife's claim for equitable distribution and, on November 18, 2004, entered the order under review. In that order Wife was awarded 100% of the marital estate valued at $57,788.39, and, because this "modest marital estate" was deemed "insufficient to compensate Wife for her highly significant contribution to the marital estate," she was also awarded $83,830 in equitable reimbursement, said to represent "on a dollar-for-dollar basis, the amount by which Wife out-earned Husband in 1990 through 1994." Trial Court Opinion, 2/22/04, at 11–12.[2] The divorce decree was entered December 7, 2004. Husband filed

---

**2.** This amount was derived by totaling Wife's earnings from 1990 through 1994 and sub-

a notice of appeal on December 14, 2004; Wife filed a notice of cross-appeal on December 23, 2004. On February 22, 2004, the trial court entered an opinion explaining its rationale for the equitable distribution order.[3]

■ ¶4 In his appeal, Husband raises four questions for review:

(1) [Did] the [trial] court err[ ] and abuse[ ] its discretion in awarding Wife 100% of the marital assets and equitable reimbursement as compensation for her contributions to the marriage?

(2) [Did] the [trial] court err[ ] and abuse[ ] its discretion in awarding Wife 100% of the marital estate plus equitable reimbursement when her contributions to the marriage did not exceed her support obligations?

(3) [Did] the [trial] court err[ ] and abuse[ ] its discretion in failing to consider Wife's own advanced degree that she acquired during the marriage?

(4) [Did] the [trial] court err[ ] and abuse[ ] its discretion in failing to consider the length of time the parties were married after the period for which equitable reimbursement was ordered?

Husband's Brief at 5.[4]

■ ¶5 Our standard for review of awards of equitable distribution is well settled.

The trial court has broad discretion in fashioning such awards, and we will overturn an award only for an abuse of that discretion. To assess whether the trial court abused its discretion, we must determine whether the trial court misapplied the law or failed to follow proper legal procedure. Further, we measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights.

*Hayward v. Hayward,* 868 A.2d 554, 558 (Pa.Super.2005) (citing *Isralsky v. Isralsky,* 824 A.2d 1178 (Pa.Super.2003)). Our Supreme Court has described an "abuse of discretion" as "[n]ot merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused." *Zullo v. Zullo,* 531 Pa. 377, 380, 613 A.2d 544, 545 (1992) (citations omitted). In determining the propriety of an equitable distribution award, the court must consider the distribution scheme as a whole. *Schenk v. Schenk,* 880 A.2d 633, 643 (Pa.Super.2005).

¶6 In his first question, Husband contends the trial court abused its discretion in awarding Wife 100% of the marital es-

---

tracting therefrom the total of Husband's earnings for the two years (1993 and 1994) in which the record reflects he earned income.

**3.** The order had also denied Wife's Petition to Prevent Bifurcation, ordered Husband to continue to provide medical insurance for Wife until Wife is able to obtain medical insurance on her own, directed Wife to enroll in her employer's medical insurance plan at the next available opportunity, directed Husband to execute a deed transferring his right, title and interest in the marital residence to Wife and

awarded Wife counsel fees of $3,542.00 (offset by an $250.00 award of counsel fees already awarded to Husband).

**4.** We note that Wife did not file a brief in response to Husband's Brief on appeal, and also that she did not file a brief in support of her own cross-appeal. Accordingly, we quash the cross appeal. *See* Pa.R.A.P. 2101, 42 Pa. C.S.A. (appeal may be quashed for failure to follow briefing requirements).

tate plus equitable reimbursement. We disagree. .

¶ 7 We first set forth the law as it pertains to equitable distribution and to equitable reimbursement, as the two components of the order on appeal. "In making its decision regarding equitable distribution, the trial court must consider at least the eleven factors enumerated in 23 Pa.C.S.A. § 3502(a) [hereinafter "statutory factors"]." *Isralsky*, 824 A.2d at 1191. As this Court summarized in *Isralsky:*

> [T]here is no simple formula by which to divide marital property. The method of distribution derives from the facts of the individual case. The list of factors [in the Code] serves as a guideline for consideration, although the list is neither exhaustive nor specific as to the weight to be given the various factors. Thus, the court has flexibility of method and concomitantly assumes responsibility in rendering its decisions.

*Id.* (quoting *Fonzi v. Fonzi*, 430 Pa.Super. 95, 633 A.2d 634, 638 (1993)) (brackets in the original). As noted in *Isralsky*, this Court has upheld awards of 60 percent and greater of the marital estate. *Id.*[5]

¶ 8 In addition to division of the marital estate, "[t]he courts of this Commonwealth have created the doctrine of 'equitable reimbursement' as a method of compensating a spouse for his or her contribution to the marriage where the marital assets are insufficient to do so." *Schenk*, 880 A.2d at 640. As this Court further summarized in *Schenk*,

> In *Bold* [*v. Bold*, 524 Pa. 487, 574 A.2d 552 (1990)], our Supreme Court found the doctrine [of equitable reimbursement] properly was applied where wife

supported husband financially, annually contributing more than three times the amount husband contributed, for the first five years of the marriage while husband completed his post-graduate degree. Husband's attainment of that degree resulted in a substantial increase in his earning capacity. Less than two years after husband graduated with a degree in chiropractics, he asked wife to move out. The Court held that 'separate and apart from the equitable distribution of marital property, consistent with fairness, the supporting spouse in a case such as this should be awarded equitable reimbursement. . . .' In *Bold*, there was insufficient marital property to compensate wife for her financial contributions to the marriage.

*Id.* (internal citation, emphasis omitted). *See also Zullo, supra; Wagoner v. Wagoner*, 538 Pa. 265, 271, 648 A.2d 299, 302 (1994) (summarizing, "[a]t dissolution each marriage [i.e., those at issue in *Bold* and *Zullo* ] possessed insufficient assets to repay th[e wife's sacrifice] which had added so significantly to the husband's future financial status. Thus, in addition to equitable distribution, the wife in each case, for her efforts, was awarded payments, termed equitable reimbursement, in order to equalize the result."); *Twilla v. Twilla*, 445 Pa.Super. 86, 664 A.2d 1020 (1995) (applying equitable reimbursement principle to compensate wife for lost equity in marital home due to husband's failure to maintain mortgage payments where there was insufficient marital property from which to fashion sufficient equitable distribution award); Joanne Ross Wilder, Pennsylvania Family Law Prac. & Proc. (West 2005), § 22–13 (2002) (noting "[e]quitable

---

**5.** Husband strives throughout his brief on appeal to characterize the order on appeal as unprecedented. This characterization, whether warranted or not, is not particularly helpful as equitable distribution orders are intensely fact specific and subject to abuse of discretion review.

reimbursement may also be available [in the context of professional degrees, licenses and practices] where alimony is not appropriate but where fairness dictates an award of some sort."). Thus, "[i]t is clear ... that equitable reimbursement is nothing more than a method of compensating a spouse for that which is fairly due to him or her." *Schenk,* 880 A.2d at 640–641.

¶ 9 In its opinion, the trial court explained that statutory factors 1, 3, and 4 through 8 played a "significant role" in its decision to award Wife 100% of the marital estate and set forth its reasoning under each of these factors. Trial Court Opinion, 2/22/05, at 8, 9. These factors are: (1) the length of the marriage; (3) the age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties; (4) the contribution by one party to the education, training or increased earning power of the other party; (5) the opportunity of each party for future acquisitions of capital assets and income; (6) the sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits; (7) the contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker; and (8) the value of the property set apart to each party.

¶ 10 Relevant to factor 1, the trial court noted the parties had been married for 18 years, and that, for 15 of those 18 years, Wife had "supported Husband fully in the pursuit of [his goal of becoming a specialist in oncology] through her financial contribution to the marriage and her contribution as a caretaker for the home and the parties' daughter." Trial Court Opinion, 2/22/04, at 8–9. Relevant to factors 3, 5, and 6, the trial court explained that, while the parties were the same age and both in good health, and Wife possessed a Master's Degree and currently earned $50,000 per year, "Husband's extensive training in the medical field will afford him the opportunity to earn significantly greater income than Wife." *Id.* at 9. The trial court deemed it significant that in his first year as a specialist at a salary of $225,000, Husband had earned $11,250 in retirement assets (compared to the $11,841.12 in retirement funds Wife had earned in the 14 years she contributed to a pension fund), while Wife testified she could not presently afford to contribute to her employer's retirement plan. *Id.* Also deemed relevant was Husband's receipt of medical insurance at no cost, compared to Wife's cost of obtaining medical benefits through her employer. *Id.* Relevant to factor 8, the trial court recognized that, in addition to his growing retirement benefits, Husband owned a three-bedroom home in Washington. *Id.*

¶ 11 The decision to award Wife 100% of the marital estate, however, rested largely upon consideration of statutory factors 4 and 7. Relevant to these two factors, the trial court explained:

> The reason the parties came to this country was for Husband to pursue his dream of becoming an oncologist. Wife, and Wife alone, carried the family financially in the years 1990, 1991, and 1992.... Wife also testified that she was the sole breadwinner in 1986, 1987 and 1988. ... [I]n 1993, Husband earned only $3,740 while Wife earned $22,870. In 1994, Husband earned $7,203 while Wife earned $24,845. Although Husband out-earned wife from 1995 through 2000, Wife continued to make a significant contribution, with her income increasing annually from $24,351 in 1995 to $33,769 in 2000. The Court found Wife's testimony that she put her family first to be credible. It was readily ap-

parent that Wife followed Husband to Rochester, Jacksonville and Pittsburgh in order for Husband to pursue his career goals and that Wife put the pursuit of her own career advancement on the backburner. When Husband unilaterally decided to abandon the marriage once he had achieved his long sought professional plateau, it became clear that Wife's lengthy subordination of her career to her Husband's was a subordination done to her significant detriment.

*Id.* at 9–10 (record citations omitted). Thus, Wife was awarded 100% of the marital estate valued at $57,788.93.

¶ 12 The trial court then deemed the marital estate insufficient to compensate Wife for her contributions to Husband's increased earning power and awarded her an additional $83,830. Trial Court Opinion, 2/22/04, at 12. The trial court stated its belief that, because Wife had been the sole wage earner in 1990 thorough 1994, this case "appears to be an even stronger one for equitable reimbursement" than in *Bold* wherein the Husband had contributed some income, and that, just like Mrs. Bold, Wife had subsidized Husband's education. *Id.* at 12. Finally, the trial court explained that "like Mrs. Bold, Wife was cast off just as Husband was on the brink of realizing his earning potential," and that during the fifteen years in which she might have been advancing her own career, she instead dedicated her efforts to Husband's dream, "reasonably [thinking] the pursuit of the dream was a team effort," only to discover it was not, and never to share in the fruits of the effort. *Id.* at 12–13.

¶ 13 In attacking the equitable distribution on appeal, Husband first points to a number of facts that he claims the trial court ignored in its analysis of the statutory factors and in its attempt to effectuate economic justice between the parties. Specifically, Husband stresses that (1) he was already a surgeon at the time of marriage; (2) the parties made a joint decision to pursue the "American Dream;" such that Wife held the dream for herself and worked towards it; (3) he always contributed his earnings, however small at times, to the family; and (4) he, as well as Wife, worked diligently to support the family. According to Husband, the fact that he was a surgeon before marriage meant that he had always had a higher earning capacity than Wife, even without the education and training she helped to subsidize in the United States. He also asserts it was this prior medical education, as opposed to the degrees and training earned during the marriage, which enabled him to pursue a medical career here. Overall, he argues that the trial court's failure to consider these facts of record reveals bias towards Wife and shows that the award was actually designed to punish Husband for failing at marriage.

¶ 14 The facts Husband highlights are obviously important to effectuating economic justice between the parties, but we do not perceive that the trial court failed to consider them, or dealt with them inappropriately. The trial court understood Husband was a surgeon before marriage, *see* Trial Court Opinion, 2/22/05, at 2, but also recognized that his prospects for advancement in China were limited, thus prompting the immigration. And while his Shanghai degree no doubt served as the initial stepping stone allowing Husband to pursue a medical career in the United States, the fact remains that, whether necessary or not, Husband spent fifteen years of this eighteen year marriage pursuing the additional degrees and training that make him the specialist he is today. It was Wife's efforts towards the attainment of Husband's current status as an oncologist in this country which drove the equitable distribution in this case, not

some effort on the part of the trial court to equalize the parties' earning capacity where they are otherwise unequal.

¶ 15 The trial court does state, as Husband notes, that "[t]he reason the parties came to this country was for Husband to purse his dream of becoming an oncologist." Trial Court Opinion, 2/22/04, at 9. Husband contends this is a distortion of the record, which actually reflects that the decision to immigrate was a joint decision and that Wife too sought the American dream and dedicated her efforts not merely to Husband's goal but to her own advancement as evidenced by her receipt of a Master's degree and her increased earnings. Our review of the record confirms Husband's characterization of the decision but also confirms that it was Husband's medical career, then stymied in China, which provided the main impetus for the decision to immigrate. Moreover, once in the United States, while Wife advanced her education and earning potential, she also put her career on hold and dedicated her efforts to the family, thereby enabling Husband to pursue his goal of becoming an oncologist. We fail to perceive how Wife's own embrace of the 'American dream' in any way alters the fact that her efforts subsidized Husband's education just as in *Bold*, thus making equitable reimbursement appropriate.

¶ 16 Husband also contends that the trial court generally failed to acknowledge his diligent efforts on behalf of the family and specifically failed to account for monies he contributed in the years for which Wife was awarded equitable reimbursement (1990–1994).[6] The record reflects, and Wife testified, that Husband always worked diligently towards the family's ultimate goal of bettering their lives through his career. We do not mean, nor do we perceive that the trial court meant, to belittle his efforts in this regard. For present purposes, however, what is most relevant to review of the order on appeal is the financial support Husband contributed to the family in 1990–1994. The record contains W–2 statements corresponding to the couple's income tax returns in those years only for Wife. It also reflects, and the trial court explicitly recognized, that Husband earned $3,740 in 1993 and $7,203 during 1994. Even assuming he contributed all of his earnings in the relevant time period to the family, the fact remains that Wife's earnings in support of herself, her daughter and her husband far exceeded his and permitted him to devote his efforts to his education and training. The trial court accounted for Husband's contributions in 1993 and 1994 by granting Wife equitable reimbursement only for the amount by

6. Husband takes issue with the finding that Wife was the sole breadwinner in 1986–1988 and contends that Wife's own testimony shows this to be false. She testified: "[Husband] took seven years in the Ph.D. study. A couple of years prior to the Ph.D., he was working in the post-doctorate, like a fellow in the lab, which was a very tough job. It was a very, very minimum pay..." N.T. Hearing, 6/1/04, at 22 (incorporated at 11/9/04 Hearing). Citing this testimony and noting that he began his Ph.D. study in 1988, Husband posits, "therefore, if [Husband] was working prior to that time, it had to be during years 1986 to 1988." Husband's Brief at 16. We note, however, that Wife also testified: "[Husband] ha[d] [a] limited fellowship during 1986 to 1988, ... but his fellowship mostly he spent on his education, books, a lot of things," N.T. (Hearing), 11/9/04, at 31, and that "all of the income for ..: 1986, 1987 and 1988, were generated from her, and [H]usband did not contribute at that point in time, income, because he was not permitted to under his visa." *Id.* at 13–14. Husband did not testify regarding his earnings during 1986, 1987 or 1988, and the tax records admitted below do not reflect any earnings for Husband in those years. Thus, we will not disturb the trial court's finding nor its apparent consideration of this fact as relevant to effectuating economic justice between the parties.

which she out-earned him during this period. The trial court explained that it had also rejected Wife's claim ·for equitable reimbursement from 1996 through the parties' separation in 2001. Thus, we fail to see how Husband's contributions were ignored.

¶ 17 This leads us directly to Husband's challenge to the manner in which the equitable reimbursement award was fashioned. He argues "the law does not require a dollar-for-dollar accounting at the time of divorce; rather it requires an effecting of economic justice between the parties." Husband's Brief at 16. Husband's argument contains the seed of its own rejection.

¶ 18 A major premise of the Divorce Code is to effectuate economic justice between the parties. *Wagoner,* 538 Pa. at 269, 648 A.2d at 301 (citing 23 Pa.C.S.A. § 3102(a)(6)); *Isralsky,* 824 A.2d at 1185. As our Supreme Court has expressed, *Bold* and *Zullo* "espouse the notion that the equitable purposes underlying the Divorce Code allow for liberal interpretation of its provisions." *Wagoner,* 538 Pa. at 270, 648 A.2d at 302. There is no set method for formulating equitable reimbursement; the overarching guideline is fairness. *See Bold,* 524 Pa. at 496, 574 A.2d at 556; *see also Twilla,* 664 A.2d at 1024 (suggesting fairness principle underlying equitable reimbursement would support award compensating wife for lost equity in marital residence). While Husband is correct that the law does not require ·a dollar-for-dollar accounting, it does not forbid such where deemed, as it was here, to effectuate economic justice between the parties. On this record, we will not disturb the trial court's exercise of its discretion in valuing Wife's contributions for purposes of equitable reimbursement.

¶ 19 Husband also argues that "some parties acquire tremendous assets during [a] marriage while others do not." Husband's Brief at 9. By this, we do not understand him to challenge the trial court's valuation of the estate at $57,788.93 or its award in the entirety to Wife. Rather, he appears to argue that awarding equitable reimbursement in addition to 100% of the marital estate punishes him for the parties' failure to acquire material possessions during their marriage; had the estate been larger, presumably, Wife would have been awarded less in equitable reimbursement. Husband's argument, however, is misguided. The appropriate amount of equitable reimbursement is tied not to the value of the parties' marital estate but to the value of Wife's contributions towards his increased earning capacity. The marital estate is what it is; where insufficient for any reason to compensate the supporting spouse for his or her efforts towards the supported spouse's increased earning capacity, equitable reimbursement may be appropriate. Thus, we can discern no abuse of the trial court's discretion in this regard. ·

¶ 20 In his second question, Husband contends the trial court abused its discretion where Wife's contributions to the marriage did not exceed her support obligations such that equitable reimbursement was appropriate. We disagree.

¶ 21 It is true, as Husband asserts, that spouses owe a duty of support to one another and to any children borne of the marriage. *See Lehmicke v. Lehmicke,* 339 Pa.Super. 559, 489 A.2d 782, 789 (1985) (Wieand, J., concurring and dissenting). However, in *Bold,* our Supreme Court held, consistent with the "legally imposed duty of support" and with fairness, that a spouse shall be awarded equitable reimbursement to the extent that his or her contribution to the education, train-

ing or increased earning capacity of the other spouse "exceeds the bare minimum legally obligated support." 524 Pa. at 496, 574 A.2d at 556.

¶ 22 Here, the trial court explicitly found that Wife's contribution exceeded her bare minimum legal obligation of support and explained that, "[j]ust as in *Bold,*" even though Wife did not directly pay for Husband's educational expenses, were it not for her financial contributions to support the family, Husband could not have pursued his extensive education. Trial Court Opinion, 2/22/05, at 12. While Husband strives to portray Wife's contributions as "no[ ] more than she was legally obligated to do," and suggests that she worked "presumably for the same reason that many women work outside the home"—i.e., "because one income was deemed insufficient to support the family,"—Husband's Brief at 19, we find the trial court's reasoning on this point to be fully supported by the record as well as grounded in the reasoning of *Bold.* Husband's pursuit of his education and training was particularly extensive here, and, throughout that time, Wife frequently served as the sole or main wage-earner for the family and repeatedly subordinated her opportunities for career advancement, all in an effort to allow him to pursue his career goal. Thus, the trial court did not abuse its discretion in concluding that Wife's contribution exceeded the bare minimum of legally obligated support and that equitable reimbursement was appropriate.

¶ 23 In his third question, Husband contends the trial court abused its discretion by failing to consider Wife's own advanced degree. Specifically, he argues that Wife's receipt of a Master's Degree during the marriage distinguishes this case from *Bold* and renders equitable reimbursement unfair. He also contends the trial court ignored his contributions to Wife's education

and did not consider how the Masters Degree increased her earning power relative to statutory factor 4. We find no abuse of discretion.

¶ 24 Wife pursued her Master's degree in Travel and Tourism at the Rochester Institute of Technology from 1987 until its award in 1990. She was employed part-time during this endeavor, while Husband worked as a laboratory fellow earning minimal pay. The trial court explained it did not ignore Wife's Master's Degree but concluded that, even with her advanced degree and current employment, Husband's earning capacity still significantly exceeded Wife's. The trial court added that, given Wife's years of subordinating her career to Husband's, she "can never catch up for the years she has missed." The value of her advanced degree, in other words, must be considered in light of the circumstances.

¶ 25 Husband argues the law does not instruct the court "to compare the education of the parties to see who has the 'greater' earning capacity[;] rather it instructs the court to review the contribution of the party to the education and increased earning capacity of their spouse." Husband's Brief at 22. Statutory factor 4, however, overlaps with statutory factor 3, requiring consideration of the "amount and sources of income, vocational skills [and] employability" of both parties. We do not perceive that Husband's contribution to Wife's education was ignored but rather was legitimately seen on this record as amounting to far less than Wife's contribution to his education. That the wife in *Bold* did not attain any additional education during the marriage does not serve to differentiate this case in any way that would render equitable reimbursement unfair. Moreover, despite Husband's attempts to paint a rosy picture of Wife's current potential for advancement with her

Master's Degree, we agree with the trial court that the value of that degree to her earning capacity must be considered in light of the many years and opportunities lost since its receipt.

¶ 26 In his fourth question, Husband contends the trial court abused its discretion by failing to consider the length of time the parties were married after the period for which equitable reimbursement was awarded. Noting that he began to out-earn Wife in 1995 and that they did not separate until November 2001, Husband contends Wife enjoyed the financial benefits of his increased earnings for at least six years and had thus already recouped her contribution to his education or increased earning power by the time of the order. We see no abuse of discretion.

¶ 27 In *Bold*, the Supreme Court stated: Among other matters of fairness, a court considering a claim for equitable reimbursement will have to consider the length of time the parties were married after the supported spouse began to enjoy the financial benefits of his or her increased earning capacity and the use to which these increased earnings were put. If the supported spouse contributed his or her increased earnings to the marriage and sufficient time has passed such that the supporting spouse has enjoyed these financial benefits commensurate with his or her contribution to the education or training that made them possible, equitable reimbursement would be inappropriate.

524 Pa. at 496 n. 5, 574 A.2d at 556 n. 5.

¶ 28 In this case, equitable reimbursement was awarded to Wife for the period 1990 through 1994—i.e., the period for which the record reflects that she was either the sole or the main wage earner. The trial court explained that it *had* considered the length of time the parties remained married after Husband began to

out-earn Wife but still deemed equitable reimbursement appropriate because, between 1996 and 2001, when Wife might otherwise have been reaping the rewards of her contribution, Husband was still pursuing medical training and Wife was still making significant financial contributions to permit this. Trial Court Opinion, 2/22/04, at 13. The pertinent language in *Bold*, far from establishing any presumption against equitable reimbursement where the parties have remained married after the supported spouse began contributing increased earnings to the marriage, permits a court to assess the use to which those increased earnings were put and whether the supporting spouse has actually enjoyed financial benefits commensurate with her contribution to the education or training that made them possible. *See Bold*, 524 Pa. at 496 n. 5, 574 A.2d at 556 n. 5.

¶ 29 Here, the record supports the trial court's finding that Wife was still making significant financial contributions to permit Husband to pursue further medical training during the pertinent period. Husband completed his Ph.D. in 1995. In 1997, he entered a residency program which took him four years to complete. In 2001, he obtained a fellowship in oncology in Pittsburgh, a position that was not necessary for Husband to practice medicine but which allowed him to become a specialist in oncology which, in turn, would eventually allow him to earn more money. During this period, Husband's earnings did exceed Wife's but not by any great amount. *See* Defendants' Exhibit 1 (W–2 Statements for Husband and Wife from 1995–2000). In addition, the modest marital estate tends to suggest that the parties did not significantly increase their standard of living during this period. Rather, on this record, it appears that the period of enjoyment for the parties' joint efforts towards

Husband's specialized medical career did not materialize until after the parties separated. Under the circumstances, the trial court did not abuse its discretion in awarding Wife equitable reimbursement six years after Husband began to contribute his increased earnings to the marriage.

¶ 30 In affirming the order of equitable distribution, we are not unmindful of Justice Zappala's caution in his dissenting opinion in *Bold* that marriage cannot and should not be "reduced to a balance sheet retroactively weighing individual efforts made at a time when the individual labors on behalf of the family unit." *See* 524 Pa. at 497, 574 A.2d at 557 (Zappala, J., dissenting). We are satisfied, however, that the equitable distribution in this case is not an abuse of discretion and does not represent, as Husband suggests, a radical departure from the settled law of *Bold.*

¶ 31 Order affirmed. Cross-appeal quashed.