J-A11013-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| AYMAN W. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| MAGY W. | |
| Appellee | No. 1237 EDA 2014 |

Appeal from the Decree of March 31, 2014
In the Court of Common Pleas of Delaware County
Civil Division at No: 06-8192

BEFORE:  FORD ELLIOTT, P.J.E., OLSON, J., and WECHT, J.

MEMORANDUM BY WECHT, J.:                                    **FILED JULY 06, 2015**

Ayman W. ("Husband") appeals from the divorce decree entered on March 31, 2014.  Specifically, Husband challenges the February 14, 2013 order that disposed of the parties' economic claims.  After review, we affirm in part, reverse in part, and remand.

The trial court provided the following procedural history and factual summary of this case:

> [Husband] filed the initial complaint in divorce on June 12, 2006. This original complaint in divorce contained a count seeking custody. . . .  On August 3, 2006[, Magy W. ("Wife")] filed a counterclaim to [the] complaint in divorce which raise[d] claims for equitable distribution, alimony, alimony *pendente lite* (APL) and attorney's fees.  On August 22, 2006, [Wife] filed a petition for custody and on February 20, 2007, [Husband] filed a petition for custody.  On June 4, 2007, a temporary custody order was signed; [Wife] was awarded physical and legal custody of the minor child and [Husband] awarded partial physical custody and [Wife was ordered] to provide medical and school information to [Husband].

On April 30, 2008, [Husband] filed an affidavit under Section 3301(d) of the Divorce Code. . . . On June 2, 2011, the divorce hearing master, Master Pholeric, filed her report. [The trial court] note[d] that the Office of Judicial Support records show that on June 16 and 21, 2011, [Wife] filed an appeal from the divorce hearing officer's report and requested a hearing *de novo*.

On January 30, 2013, [the trial court] held a *de novo* hearing, following the hearing[, the trial court] took the matter under advisement. On February 14, 2013, [the trial court] issued a final order of equitable distribution, which is the subject of this appeal.

On February 27, 2013, [Husband] filed a notice of appeal. On March 11, 2013, [the trial court] issued an order requesting a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). In response to the 1925(b) request, [Husband] submitted his concise statement of [errors] complained of on appeal. On April 26, 2013, the Superior Court of Pennsylvania issued an order quashing [Husband's] appeal . . . as the parties were not divorced and . . . the appeal was interlocutory.

On March 31, 2014, a final divorce decree was signed . . . .

On April 16, 2014, [Husband] filed a notice of appeal. On April 21, 2014, [the trial court] issued an order requesting a statement of errors complained of on appeal . . . . [Husband timely complied. On June 2, 2014, the trial court filed its Pa.R.A.P. 1925(a) opinion].

\* \* \*

[Husband] currently resides [in Arizona], with his [fiancée]. [Wife] currently resides [in Morton, Pennsylvania], with the parties' minor child and her parents.

Wife and minor child reside with Wife's parents due to Wife's diagnoses. Wife has been diagnosed with "chronic mental retardation of unclear etiology." In May of 1989, it was determined that Wife had an IQ of 47 and in 1992[,] it was determined that Wife had an IQ of 63.

Wife was an Egyptian citizen until she immigrated to the United States with her family in 1987, when Wife was fifteen (15) years

old. Wife and Wife's family traveled to Egypt yearly for extended vacations. Wife is fluent in both English and Arabic.

The parties met in Egypt in 2000, while Wife was on vacation in Egypt with her family. When the parties met, Husband was living in Egypt, as he had his entire life, and Husband was an Egyptian citizen. At the time the parties met, Husband had graduated from the University of Cairo Veterinary School. Husband had graduated from the University of Cairo in 1998 and although he was a licensed veterinarian in Egypt, he was not working full time in that field in 2000. Husband testified that he was a veterinarian "on the side." At the time the parties met in 2000, Husband was working as a pharmaceutical representative for the largest pharmaceutical company in Egypt. By Egyptian standards Husband was making a very good living, he enjoyed the use of a company vehicle and he had three weeks of vacation outside Egypt and two, two[-]week vacations in Egypt.

The parties met as a result of discussions between Husband and Wife's uncle. The parties' first meeting occurred with Wife's parents, Wife's uncle, and Wife's brother present, as well as Husband's family. [The trial court] heard testimony of certain dating customs in Egypt, which included interactions between the parties that is "supervised" by other adults or family members. Despite the conservative Christian nature of the culture in Egypt, the parties did have conversations between themselves, alone. Wife accompanied Husband to meet Husband's family alone. Prior to their engagement, member[s] of Wife's family had conversations with Husband regarding Wife's limitations and mental abilities. [The trial court] credited the testimony of Wife and Wife's family, that Husband and Wife met numerous times both prior to the engagement and the wedding. [The trial court] also credit[ed] the testimony that Wife's family had conversations with Husband regarding Wife's mental abilities and limitations prior to the marriage and that with full knowledge of the mental limitations and abilities of Wife, Husband proceeded with the marriage.

The parties were engaged on October 6, 2000. Following the engagement, Wife returned to Pennsylvania. Wife and her family returned to Egypt prior to the wedding ceremony. The parties were married in a civil ceremony on February 1, 2001 and a religious ceremony on February 9, 2001. Both ceremonies occurred in Egypt.

Following the marriage and honeymoon in Egypt, Wife returned to Pennsylvania. [The trial court] heard testimony that Wife and Wife's family helped Husband acquire the necessary paperwork to enter the United Stated following the marriage. Thereafter, Husband came to Pennsylvania. Husband's delay in traveling to the United States was as a result of his ability and eligibility to obtain a visa following his recent marriage to a United States' citizen. Upon entering the United States, specifically Pennsylvania, Husband was employed in several different jobs while obtaining the necessary certifications and/or licenses to work as a veterinarian in the United States. [The trial court] heard conflicting testimony from the parties.

Although Husband and Wife were both working in 2001, Husband and Wife resided with Wife's family. [The trial court] credit[ed] the testimony of Wife and Wife's family that Wife, as part of her belief in the customs of a traditional Egyptian marriage, provided all her earnings to Husband. [The trial court] also credit[ed] the testimony of Wife and Wife's family that Husband was earning very little money at the time and despite Husband's testimony to the contrary, [the trial court] determine[d] that Wife's family supported the parties.

For the length of their marriage, and following the separation of the parties, Wife consistently resided with her family. Wife has very [few] skills and [little] academic ability. During the early part of the parties' marriage, Wife was employed as a bagger in a supermarket. Also, during the marriage, Wife received a monthly stipend from Social Security Disability. [The trial court] note[d] that the amount of Social Security Disability Wife received while she was employed was decreased. Currently, Wife receives somewhere between six hundred ($600) and seven hundred dollars ($700) a month from Social Security Disability.

In August of 2002, Husband separated from Wife by fleeing the country. Husband told Wife and Wife's family that he was going to the library at the University of Pennsylvania[. I]nstead he fled to his family home in Egypt. Husband was in Egypt for three (3) weeks; however, he was convinced by both his family and Wife's family that he needed to return to [] Wife in Pennsylvania. Husband returned to Pennsylvania and continued to reside with Wife and Wife's family. After returning to Pennsylvania, Husband continued to pursue obtaining his certificate in veterinary medicine in the United States.

During the time period of October 2003-October 2004, Husband moved by himself to Oklahoma to attend school at Oklahoma State University so that he could obtain a certificate so he would be able to work as a veterinarian in the United States. In order to pay for this schooling, Husband obtained a student loan. During the trial, Husband estimated that the loan amount was approximately thirty[-]four thousand dollars ($34,000). Husband candidly testified that this loan has not been satisfied and that the loan is in collection. Husband failed to testify as to the outstanding loan balance as of the date of the equitable distribution hearing or the balance as of the date of separation. Husband is currently paying the collection agency approximately three hundred and fifty dollars ($350) a month.

[The trial court] note[d] that Husband was very candid with the court that during that one year time period that he resided in Oklahoma, Husband only returned to Pennsylvania on one occasion, for the birth of his only child. The parties have one child, [M.W. (born in February 2004). The trial court] note[d] that this child was conceived using in vitro fertilization. [The trial court] heard testimony that Wife and Wife's family paid the in vitro fertilization costs. [The trial court] credit[ed] the testimony of Wife and Wife's witnesses that Husband refused to have Wife live with him [in] Oklahoma during that time period, despite Wife's pleas to reside in Oklahoma with [] Husband.

Following his graduation from Oklahoma State University Husband received a certificate which permits him to work as a licensed veterinarian in the United States. Husband is currently licensed to work in Pennsylvania, California and Arizona as a veterinarian.

Following his graduation from Oklahoma State University, Husband moved to Phoenix, Arizona for training. Wife did not move to Arizona with Husband nor did Husband take [M.W.] with him to Arizona. During this time period, Wife and [M.W.] continued to remain in Wife's family residence.

In 2005, Husband moved back to Pennsylvania to live with Wife and [M.W.]. In September of 2005, Husband was working as a veterinarian in Pennsylvania and earning approximately sixty[-]five thousand dollars ($65,000) a year, plus Husband received a twenty[-]five thousand dollar ($25,000) signing bonus.

On or before March 17, 2006, Husband purchased a used Land Rover for approximately eleven thousand dollars ($11,000).

Husband obtained a loan, in his name alone, for this vehicle. Husband lived with Wife, [M.W.,] and Wife's family for approximately eight to nine months, before moving out of the residence on March 26, 2006. The parties stipulated to the date of separation as March 26, 2006. After separation on March 26, 2006, Husband received a job offer in Arizona. Husband accepted the job offer and moved to Arizona in July of 2006. Following his move to Arizona in July of 2006, Husband was earning approximately eighty five thousand dollars ($85,000) plus overtime.

In June of 2007, Husband began his residency in southern California. Husband testified that this was supposed to be a six (6) month veterinarian residency program. Husband once again applied for and received a loan, again in his name alone, for this residency program. For economic reasons, Husband only stayed in this residency program in southern California for one month. Husband then returned to the veterinarian job in Phoenix, Arizona.

Husband testified that his salary has varied greatly since 2005, due to the economic climate in the United States over the last few years. [The trial court] heard testimony that in 2009 Husband earned approximately one hundred and eighty one thousand dollars ($181,000). In 2010, Husband earned approximately one hundred and forty eight thousand dollars ($148,000). Husband was laid off in December of 2010. In anticipation of being laid off, Husband resourcefully obtained other employment in the veterinarian field. Immediately prior to being laid off in 2010, Husband created his own company, which he still owns and operated to this day. Husband continues to work as a veterinarian through this business that he owns and operates. Husband utilizes a website to apply for jobs in veterinary clinics, offices or hospitals in Arizona and California where he covers the various veterinarian offices for other doctors who are on vacation or otherwise unavailable and where those offices require a veterinarian to be on staff.

In 2011, Husband's individual tax return shows an income of seventy[-]eight thousand one hundred and seventy nine dollars ($78,179) and his company's tax returns show an income of one hundred forty[-]eight thousand five hundred and forty[-]seven dollars ($148,547). Husband's pay stubs for 2012 reflect that he earned seventy[-]two thousand four hundred and thirty[-]nine []

dollars ($72,439) and that be netted fifty[-]eight thousand four hundred and thirty[-]four dollars ($58,434).

Husband sold his Land Rover on September 30, 2011 for two thousand eight hundred dollars ($2,800) and kept for himself the proceeds. As of the date of the equitable distribution trial, Husband was paying both child support and spousal support.

At no time during the marriage did the parties purchase or rent their own marital home, the parties either lived with Wife's family, or Husband rented his own residence when he lived in Oklahoma, Arizona or California. [The trial court] heard testimony that neither party has a pension, IRA or other retirement accounts.

During the marriage, the parties had three credit cards. The three credit cards were from Chase [], PNC-MBNA ([5233]) and PNC-MBNA ([3288]). [The trial court] heard credible testimony that upon separation, sometime after march 26, 2006, Husband withdrew two thousand dollars ($2,000) from the parties' Chase credit card line of credit for his personal use.

Husband candidly testified that he continued to regularly pay the three credit card balances after separation. [The trial court] saw evidence that Husband paid the credit card balances from March 26, 2006 until he was denied online access to those accounts. Following the parties' separation, Husband paid a total of six thousand one hundred fifty[-]nine dollars and sixty one cents ($6,159.61) of the marital credit card debt from date of separation, March 26, 2006, until March of 2008.

The parties also had a joint checking/savings account with Bank of America. At the time of separation the account balance of the joint checking/savings accounts were between two thousand and four thousand dollars ($2,000 to $4,000). [The trial court] determine[d] that the date of separation balance of the Bank of America accounts [was] three thousand dollars ($3,000).

As of February 14, 2013, the parties had been separated for six (6) years and ten (10) months.

Trial Court Opinion ("T.C.O."), 6/2/2014, at 1-3, 5-13 (modifications to capitalization; footnotes and citations to record omitted).

In its February 14, 2013 order, the trial court awarded Wife sixty percent of the marital estate and awarded Husband forty percent. However, the marital estate was small and Wife was to receive only $8,466. Husband was to be responsible for any remaining debt on the three credit cards, as well as his student loans. Wife was awarded $5,000 in counsel fees. The trial court also awarded Wife alimony of $1,200 per month until December 31, 2025, which is the year in which M.W. will turn twenty-one years old.

Husband raises nine issues in his appeal:

1. Whether the Trial Court erred and/or abused its discretion by failing to include Husband's student loan as a marital debt?

2. Whether the Trial Court erred and/or abused its discretion by failing to include Wife's [Social Security Disability] Income as a marital asset?

3. Whether the Trial Court erred and/or abused its discretion by failing to include the 2005 tax penalty/liability that resulted from Wife's receipt of [Social Security Disability] income as a marital debt?

4. Whether the Trial Court erred and/or abused its discretion by failing to include Husband's car loan as a marital debt?

5. Whether the Trial Court erred and/or abused its discretion by including Husband's Land Rover as a marital asset?

6. Whether the Trial Court erred and/or abused its discretion by failing to credit Husband for the payments that he made post-separation toward the credit card debt and/or to include same as marital debt?

7. Whether the Trial Court erred and/or abused its discretion by requiring that Husband pay the outstanding balance of credit card debt?

8. Whether the Trial Court erred and/or abused its discretion in awarding Wife attorney fees?

9. Whether the Trial court erred and/or abused its discretion in awarding Wife alimony?

Husband's Brief at 4.

Husband's first seven issues involve allegations of error in the trial court's equitable distribution decision. We evaluate such claims according to the following standard of review:

> A trial court has broad discretion when fashioning an award of equitable distribution. **Dalrymple v. Kilishek**, 920 A.2d 1275, 1280 (Pa. Super. 2007). Our standard of review when assessing the propriety of an order effectuating the equitable distribution of marital property is "whether the trial court abused its discretion by a misapplication of the law or failure to follow proper legal procedure." **Smith v. Smith**, 904 A.2d 15, 19 (Pa. Super. 2006) (citation omitted). We do not lightly find an abuse of discretion, which requires a showing of clear and convincing evidence. **Id.** This Court will not find an "abuse of discretion" unless the law has been "overridden or misapplied or the judgment exercised" was "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record." **Wang v. Feng**, 888 A.2d 882, 887 (Pa. Super. 2005). In determining the propriety of an equitable distribution award, courts must consider the distribution scheme as a whole. **Id.** "[W]e measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights." **Schenk v. Schenk**, 880 A.2d 633, 639 (Pa. Super. 2005) (citation omitted).

**Biese v. Biese**, 979 A.2d 892, 895 (Pa. Super. 2009). However, the definition of what is and is not marital property is controlled by statute and, to the extent we must interpret that statutory definition, it is a question of law with a *de novo* standard of review. **Focht v. Focht**, 32 A.3d 668, 670 (Pa. 2011).

The statutory definition of marital property is broad, encompassing "all property acquired by either party during the marriage." 23 Pa.C.S. § 3501(a). The statute presumes that property acquired during the marriage is "marital."

*Id.*

Husband first argues that the student loan incurred to permit him to obtain his veterinary license in Oklahoma should have been included as a marital debt because the debt was incurred during the marriage. Further, Husband contends that the debt allowed him to increase his earnings once he obtained his license, and that Wife has benefited directly from this increased income. Husband also argues that the trial court considered Husband's license and increased earnings in deciding to award Wife a greater share of the marital estate and alimony, and that it also was inequitable to not divide the student loan debt. Husband's Brief at 13-14.

Husband is correct that student loans incurred during the marriage are marital debt. *See Hicks v. Kubit*, 758 A.2d 202, 204 (Pa. Super. 2000). However, Husband misapprehends the trial court's conclusions regarding the student loan's status. The trial court found that the student loan was marital debt, but said that the student loan was "not marital property to be equitably divided," indicating its intent to have Husband be responsible for the loan. Order ("Order"), 2/14/2013, at 9; *see* T.C.O. at 18. Although the loans were marital debt, the trial court did not apportion that debt between the parties. Generally, we have held, "that portion of the marital debt derived from [the appellant's] education properly belonged to [the

- 10 -

appellant]."  **_Hicks_**, 758 A.2d at 205.  Here, the trial court made a similar finding that Husband received the benefit of his student loans and that he should bear the burden of them as well.  T.C.O. at 18.  While Wife certainly derives an indirect benefit of Husband's greater income, Husband benefits most directly, not only through his income but in working in his chosen profession.  The trial court considered Husband's income as part of the overall distribution scheme, as it is required to do, and it also considered the other relevant factors in determining that Husband should be responsible for the loans.  We find no error in this consideration or in the trial court's decision that Husband is responsible for his student loans.

Husband next argues that Wife's Social Security Disability ("SSD") payments should have been considered a marital asset.  Social Security benefits are not subject to equitable distribution.  **_See Powell v. Powell_**, 577 A.2d 576, 580 (Pa. Super. 1990).  However, Husband contends that he does not seek distribution of Wife's income, but instead distribution of a savings account maintained by Wife's mother into which Wife deposited her disability checks.  Husband's Brief at 14-15.

Husband testified that he was unaware that Wife was receiving SSD payments until after the separation.  Notes of Testimony ("N.T."), 1/10/2013, at 59.  Husband produced a document stating that Wife received SSD payments in December 2007 of $653.00.  **_Id._** at 67, Exh. P5.  Wife could not remember clearly how much SSD she received.  **_Id._** at 227-28.

However, Wife thought that her mother deposited her checks into an account. *Id.* at 238.

Wife's mother testified that she gave the money to Wife in small amounts as spending money. *Id.* at 270-71. Wife's mother also testified that, for some period of time after the parties were married, she did not tell Husband about Wife's SSD payments because she believed that Wife would give all the money to Husband like Wife did with her paychecks. *Id.* at 270, 287. However, Wife's mother later disclosed the payments to Husband. *Id.* at 292. Wife's mother testified that she gave the money to Wife for clothes and other things that she needed. *Id.* at 301.

The record is unclear regarding the amount of the SSD payments Wife received or if the money was used or saved. While Wife suggested that the money was deposited into a bank account, Wife's mother testified that the money was used to support Wife. Husband provided no evidence of an account in Wife's name – no direct testimony or documentary evidence. Without such evidence, the trial court could not determine the amount in Wife's account, or even if such an account existed. Therefore, we cannot say that the trial court erred in declining to include this as a marital asset.

Husband next argues that the trial court failed to include a 2005 tax liability as a marital debt. Husband suggests that the court erred in failing to include the liability as a marital debt and that there was sufficient evidence to prove the amount and existence of the debt. Husband's Brief at 17.

Husband testified that he received a notice from the IRS in May 2007 indicating that he owed additional taxes from 2005. The notice stated that $821.00 was due by June 13, 2007. The notice also stated that there was unreported income from the Social Security Administration of $7,116.00. Husband testified that Wife failed to report this income and that Husband paid the delinquent amount. N.T. at 68.

Husband is correct that the trial court's order does not address this debt. Because it was incurred during the marriage, it is a marital debt. The trial court stated that the evidence was not sufficient to determine the amount of the debt because Husband did not testify as to how much he paid, when he paid it, or if he incurred more penalties. T.C.O. at 25. However, Husband's testimony and exhibit at least established that a debt of $821.00 existed and the trial court erred in not addressing it.

The trial court suggests that, if it erred in not finding the tax liability to be a marital debt, it would not have required Wife to contribute to that debt due to Husband and Wife's respective economic positions. *Id.* at 26. Given the overall equities of this case, the negligible amount of the debt, and the trial court's rationale as set forth in its opinion, the assignment of the entire debt to Husband would not have been an abuse of discretion. Therefore, any error committed in overlooking the debt in the February 14 order was harmless. Nonetheless, because we are remanding this case on another issue, which we detail below, the trial court should address this issue directly upon remand.

Husband next makes two arguments regarding his car. First, Husband contends that the trial court should have included the car loan for his Land Rover as a marital debt because the debt was incurred during the marriage, and because he paid the debt after separation. Next, Husband argues that the value of car should not have been included in the marital estate because, at the date of separation, the loan for the vehicle exceeded its value. Husband's Brief at 18-19.

In its order, the trial court found that the Land Rover was marital property because it was purchased prior to separation. The court found that at the date of separation the car was worth $11,000. Husband sold the vehicle after separation for $2,800.00 and kept the proceeds. Order at 8. Critically, the trial court did not specifically address the car loan. The trial court awarded Wife sixty percent of the value of the car, or $6,666. *Id.* at 10.

Husband testified that he purchased the Land Rover used for $13,000. N.T. at 60. After viewing Exhibit P-4, Husband testified that the balance of the car loan was $11,675 and that that amount was close to the purchase price. Husband also testified that he traded in his prior car as part of the purchase. *Id.* at 61. Husband also produced a document showing the Blue Book value of the car at the time of sale when Husband received $2,800 for the Land Rover. *Id.* at 66.

The car, which was purchased during the marriage, is marital property. We must consider whether the associated car loan should have been

included as marital debt, whether the car had a value to be distributed as an asset, and if so, how much. The trial court found that Husband did not provide testimony or documentary evidence of the amount of the car loan. Because it could not account accurately for the loan, the trial court did not include it as a marital debt. T.C.O. at 31.

The trial court stated that it assumed a value at date of separation of $11,000 because Husband provided multiple amounts in his testimony and documentary evidence. T.C.O. at 29. The trial court chose to value the Land Rover as of the date of separation, rather than the date of trial because Husband had exclusive possession of the vehicle. *Id.* at 30.

A trial court has discretion to choose a valuation date that best serves economic justice and the same date need not be used for all assets. ***Smith v. Smith***, 904 A.2d 15, 18 (Pa. Super. 2006). Generally, the date of trial valuation is preferred. *Id.* However, under certain circumstances, such as when one spouse consumes or disposes of a marital asset or current valuation is difficult, date of separation values are more appropriate. *Id.* at 19.

Here, the trial court chose a date of separation value for the Land Rover because Husband had exclusive use and possession of the vehicle and he disposed of it during the separation. We find no abuse of discretion in the choice of valuation date. However, there was competent evidence of the value of the car loan at or near the date of separation. Exhibit P-4 clearly shows that the loan's balance was $11,675.37 as of the March 27, 2006

statement date. While Husband's testimony about the purchase price was unclear, Exhibit P-4 was admitted into evidence. This was not a credibility issue because the loan amount was not based upon Husband's testimony. The trial court could have split this debt in any manner that it belived effectuated economic justice between the parties. However, the trial court simply ignored the debt. This was error. Nor was it harmless error. The debt was significant in relation to the value of the car that the trial court did apportion. Therefore, the trial court was required to account for the debt.

We must remand for consideration of this debt. Because consideration of this issue may upset the trial court's equitable distribution scheme, our affirmance of other equitable distribution issues does not preclude the trial court from altering that distribution to achieve economic justice in light of its reconsideration.

Husband next argues that the trial court erred in failing to include the credit card debt as marital debt, failing to credit Husband for payments toward that debt, failing to require Wife to pay forty percent of the debt, and erred in requiring Husband to pay any outstanding balances. Husband's Brief at 20-21.

Husband testified that he paid approximately $6,100 post-separation toward marital credit card debt. N.T. at 70. Husband also produced his bank records that showed payments to Chase and MBNA. Husband sought credit for the amount he paid post-separation, and testified that there was no other debt for which he was seeking credit. *Id.* at 98. Husband also

testified that there was outstanding credit card debt in Wife's name, but it was unclear whether it was incurred during the marriage or post-separation. *Id.* at 181-82. Neither party provided credit card statements.[1] Neither party indicated whether any amount remaining on the credit cards were due to accruing interest charges or new, post-separation charges.[2]

Given this lack of clarity, the trial court ordered that Husband was responsible for the remaining balances on the credit cards, if any. The trial court recognized that Husband took a withdrawal from one of the credit cards after separation. Order at 8. The trial court determined that Husband should be responsible, rather than splitting the debt, after consideration of the parties' economic circumstances. T.C.O. at 33-34. The trial court found that Husband had a much greater income than Wife and that Wife turned over her paycheck to Husband during the marriage so Husband was in a better position to assume this debt. *Id.* at 34. The trial court has discretion to deal with each asset or debt discretely rather than applying a single percentage split to every part of the marital estate. *See Winters v. Winters*, 512 A.2d 1211, 1216 (Pa. Super. 1986) ("It is within the

---

[1] Wife's attorney offered specific balances in some questions to Husband. However, Husband did not affirm that those balances were correct. N.T. at 185.

[2] Wife's attorney stated that the charges were due to post-separation accrual of interest, but there was no sworn testimony or documentary evidence to this point. N.T. at 314. Husband's attorney argued that the source of any balance was unknown. *Id.* at 315-16.

discretion of the court to credit an amount to one of the parties and take such credit into consideration when dividing the marital property."). Based upon the record, the trial court did not abuse its discretion.

Husband next argues that the trial court erred in awarding counsel fees to Wife. Husband first contends that there was no evidentiary basis upon which to award fees. Husband also argues that Wife has sufficient income, including spousal and child support, to pay her own fees. Husband's Brief at 22-24.

We apply the following standard of review to a challenge to a counsel fees award:

> We will reverse a determination of counsel fees and costs only for an abuse of discretion. The purpose of an award of counsel fees is to promote fair administration of justice by enabling the dependent spouse to maintain or defend the divorce action without being placed at a financial disadvantage; the parties must be "on par" with one another.
>
> * * *
>
> Counsel fees are awarded based on the facts of each case after a review of all the relevant factors. These factors include the payor's ability to pay, the requesting party's financial resources, the value of the services rendered, and the property received in equitable distribution.
>
> Counsel fees are awarded only upon a showing of need. Further, in determining whether the court has abused its discretion, we do not usurp the court's duty as fact finder.

*Teodorski v. Teodorski*, 857 A.2d 194, 201 (Pa. Super. 2004) (citations and quotation marks omitted).

The record reflects that Wife did not provide any documentary evidence of her counsel fees. Instead, Wife's attorney represented to the court that Wife had been billed at least $11,000 to date in the course of all of the litigation. N.T. at 323. The trial court accepted that representation as evidence of counsel fees. *Id.* at 325-36. Husband's counsel did not object to this representation and did not dispute the amount. Instead, Husband's counsel argued that Husband should not be required to pay any counsel fees. *Id.* at 326.

Wife's attorney was not sworn in and his statements regarding counsel fees were not evidence. However, Husband's counsel did not object to the statements or dispute the amount. Therefore, Husband has waived this issue. *See Tecce v. Hally*, 106 A.3d 728, 732 (Pa. Super. 2014) ("Pennsylvania's appellate courts have held, without apparent exception, that the failure to object to unsworn testimony subjects a litigant to waiver.").

However, Husband did argue to the trial court about the imposition of a fee award, so we will address his second contention. The trial court awarded Wife $5,000 in counsel fees. Order at 10. The trial court based its award upon the economic circumstances of the parties, including: Husband's greater income; Wife's intellectual disability and likelihood that she will be unable to obtain significant employment; Wife's role as sole caretaker to the parties' child; Husband's superior economic position that Wife will never be able to achieve; and Husband's role in the ongoing litigation. T.C.O. at 36-

37.  The record supports these findings and the trial court did not abuse its discretion in awarding counsel fees.

Finally, Husband disputes the trial court's alimony award.  Husband first argues that the trial court awarded equitable reimbursement in the form of alimony.  Husband's Brief at 24-28.  The concept of reimbursement alimony or equitable reimbursement is to reimburse one spouse who supported the other spouse while that spouse was in school.  ***See Zullo v. Zullo***, 576 A.2d 1070, 1073 (Pa. Super. 1990); ***see also Moran v. Moran***, 839 A.2d 1091, 1098 (Pa. Super. 2003) ("Equitable reimbursement is designed to compensate a spouse for his or her contribution to the marriage where the marital assets are insufficient to do so.").  Despite Husband's characterization of the alimony award, we find nothing in the record to suggest that the trial court intended to reimburse Wife for providing support while Husband was receiving his veterinary license.  The trial court considered the support Wife and her family provided to Husband, but it was required to do so by statute.  ***See*** 23 Pa.C.S.A. § 3701(b)(6) (providing that "contribution by one party to the education . . . of the other party" is one of the factors to consider in alimony determination).  There is nothing to suggest this was the trial court's sole reason or that the alimony was calculated to reimburse Wife.

Husband next argues that the trial court erred in determining that alimony was not warranted under the facts of this case or that, if it was warranted, the trial court erred in setting the length and amount.  Husband's

Brief at 28-31. We review challenges to an alimony award for an abuse of discretion. *Moran*, 839 A.2d at 1096.

Alimony is a secondary remedy that is available when equitable distribution cannot achieve economic justice. *Id.* at 1097. Alimony ensures that the dependent spouse who cannot self-support through employment can meet his or her reasonable needs. *Id.* at 1096. The court in awarding alimony must consider the payor's ability to pay as well as the payee's reasonable needs according to the standard of living maintained during the marriage. *Id.* Further, the trial court must consider the statutory factors enumerated in 23 Pa.C.S.A. § 3701(b):

> (1) The relative earnings and earning capacities of the parties.
>
> (2) The ages and the physical, mental and emotional conditions of the parties.
>
> (3) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.
>
> (4) The expectancies and inheritances of the parties.
>
> (5) The duration of the marriage.
>
> (6) The contribution by one party to the education, training or increased earning power of the other party.
>
> (7) The extent to which the earning power, expenses or financial obligations of a party will be affected by reason of serving as the custodian of a minor child.
>
> (8) The standard of living of the parties established during the marriage.
>
> (9) The relative education of the parties and the time necessary to acquire sufficient education or training to enable the party seeking alimony to find appropriate employment.
>
> (10) The relative assets and liabilities of the parties.

(11) The property brought to the marriage by either party.

(12) The contribution of a spouse as homemaker.

(13) The relative needs of the parties.

(14) The marital misconduct of either of the parties during the marriage. The marital misconduct of either of the parties from the date of final separation shall not be considered by the court in its determinations relative to alimony, except that the court shall consider the abuse of one party by the other party. As used in this paragraph, "abuse" shall have the meaning given to it under section 6102 (relating to definitions).

(15) The Federal, State and local tax ramifications of the alimony award.

(16) Whether the party seeking alimony lacks sufficient property, including, but not limited to, property distributed under Chapter 35 (relating to property rights), to provide for the party's reasonable needs.

(17) Whether the party seeking alimony is incapable of self-support through appropriate employment.

23 Pa.C.S.A. § 3701(b).

In awarding alimony, the trial court considered that Wife had not been employed in the nine years since M.W.'s birth. Given Wife's lack of work experience and her intellectual disability, the trial court determined that she had no earning capacity because Wife would not be able to obtain viable, self-supporting employment. The court also explicitly considered that Wife solely was responsible for M.W., which left Wife unable to work. T.C.O. at 41-42. The trial court also noted that Wife does not, and cannot, drive, which further impairs her ability to work. *Id.* at 42. The trial court considered Husband's education and work history to determine that he had a

substantial earning capacity.  The trial court found that Husband entered into the marriage with full knowledge of Wife's disability.  *Id.*

The trial court found that Wife did not prove that Husband only married Wife to obtain United States citizenship, but the court was concerned about Husband's actions in leaving Wife to pursue his career.  The court also found Wife to be credible in her testimony that she wanted to move with Husband, but that Husband refused to permit it, and discredited Husband's testimony that Wife refused to move.  *Id.* at 43.  The trial court determined that Husband was supported by Wife and her family after his initial move to the United States until he received his license.  *Id.*  The trial court considered Wife's Social Security income, but found that it was minimal compared to Husband's income.  The trial court found there was no evidence that Wife would receive any inheritances.   Wife's mother was her financial guardian because Wife was unable to control her own finances and the trial court noted its concern that, when Wife's parents died, Wife would be on her own for the first time.  *Id.* at 44.

For all of the foregoing reasons, the trial court awarded Wife alimony. While the duration of the alimony award is lengthy, the facts and circumstances of the case are unusual.  The record before us supports the trial court's factual conclusions and the alimony award.  There is no abuse of discretion.

We affirm the trial court's disposition of the parties' economic claims with the exception of the trial court's failure to include the car loan as a

marital debt despite evidence of its amount. Therefore, we must reverse the order with respect to that debt and remand to the trial court for further consideration. The trial court should include in its consideration, its error, though harmless, in failing to address the tax penalty. Because equitable distribution is an entire scheme to achieve economic justice between the parties, we recognize that the trial court may be required to adjust the overall order. Our affirmance on Husband's other issues should not be interpreted as a barrier to the adjustments the trial court may make.

Order affirmed in part, reversed in part. Case remanded for further proceedings in accordance with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/6/2015